IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAL HICKS                                                    PLAINTIFF

VS.                          CIVIL NO. 06-5110

MICHAEL J. ASTRUE[1], COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                  DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Michal Hicks ("plaintiff") brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the

Social Security Administration denying her applications for a period of disability and disability

insurance benefits ("DIB") under Title II of the Act.

**Background:**

The applications for DIB now before this court were filed on October 28, 2003, alleging an

onset date of June 30, 1999, due to fibromyalgia, degenerative disc disease, a compression fracture at

the L2 level, osteoarthritis, affective disorder, anxiety, and a personality disorder.  (Tr. 12).

Administrative hearings were held on June 23, 2005, and November 1, 2005.  Plaintiff was

present and represented by counsel.  At the time of the administrative hearing on November 1, 2005,

plaintiff was fifty-three years old and possessed a college degree in education.  (Tr. 924).  The record

reveals that he had past relevant work ("PRW") experience as a resource room teacher and a teacher's

aide.  (Tr. 18).

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

The Administrative Law Judge ("ALJ") consolidated both cases and rendered an unfavorable decision on November 21, 2005.  (Tr. 10-20).  He concluded that plaintiff was insured for benefits through August 31, 2004.  (Tr. 12).  As such, the ALJ determined that the relevant time period in this case began on June 30, 1999, plaintiff's alleged onset date, and concluded on August 31, 2004, her date last insured.  After assessing plaintiff's impairments, the ALJ found that her impairments were severe but did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 14).  The ALJ then determined  that plaintiff retained the residual functional capacity ("RFC") to perform a light work limited by her mental symptoms that affected her ability to maintain attention and concentration for extended periods, maintain pace and persistence, and make plans independently of others.  As such, he concluded that plaintiff could perform work where the interpersonal contact was routine but superficial, the tasks were learned through experience with several variables, the judgment was used within limits, and the supervision was little for routine activities but detailed for non-routine activities.  With the assistance of a vocational expert ("VE") the ALJ then found that plaintiff could still perform work as a call out operator, cleaner, housekeeper, and a cashier II.  (Tr. 19).

On May 22, 2006, the Appeals Council declined to review this decision.  (Tr. 3-5). Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned for report and recommendation.  Although both parties were afforded the opportunity to file appeal briefs, plaintiff has chosen not to do so.  (Doc. # 8).  The case is now ready for decision.

AO72A
(Rev. 8/82)

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability,

3

not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Evidence Presented:**

The record reveals that plaintiff was diagnosed with fibromyalgia in the early- to- mid-1990s. (Tr. 152-158, 303). She also had a history of associated disorders, including anxiety and depression, hypercholesterolemia, irritable bowel syndrome ("IBS"), hiatal hernia, and leukocytosis. Further, x-rays of her cervical spine and sacroiliac joints taken in 1995 revealed degenerative disc disease and osteoarthritis. (Tr. 156).

On August 4, 1998, plaintiff reported problems with chronic fatigue and an altercation with her husband. (Tr. 413). Due to dysthymia and depression, plaintiff had not been able to work regularly. Dr. Stanley Deen, a staff psychiatrist at Ozark Guidance Center, diagnosed plaintiff with

4

dysthymia with decompensation, a history of panic disorder, and relationship problems.  For this, he prescribed Effexor.  Dr. Deen also noted that plaintiff should continue taking the Klonopin.  (Tr. 413).

On September 3, 1998, plaintiff indicated that she was working part-time as a resource teacher. (Tr. 412).  She was in good spirits and reported some continued problems with depression.  Dr. Deen noted that she did appear to be responding to the Effexor.  (Tr. 412).

On October 21, 2998, plaintiff reported that she had been teaching resource classes at two different schools.  (Tr. 411).  She requested that her dosage of Effexor be increased because she was still "stressed out."  Records indicate that she suffered from problems with self-esteem and had a hard time asserting herself.  Dr. Deen noted that her dysthymia was improving and her panic disorder was stable.  He increased her Effexor dosage and directed her to continue taking the Klonopin.  (Tr. 411).

By January 15, 1999, plaintiff had reportedly discontinued the Effexor because it made her "suicidal."  (Tr. 410).  Although she continued to experience increased pain associated with fibromyalgia, plaintiff had not yet begun a physical therapy program.  As such, Dr. Deen prescribed Celexa to be used in place of the Effexor.  (Tr. 410).

On February 3, 1999, Dr. Anne Miller, rheumatologist, noted diffuse 2+ tender point tenderness.  (Tr. 302).  Plaintiff complained of a fibromyalgia flare up and trouble sleeping.  She reported participating in a water therapy program, changing her mattress, and taking hot baths in an attempt to alleviate her symptoms.  Plaintiff indicated that she was experiencing pain in her lower back and posterior neck.  She also stated that she had begun working only part-time as a resource teacher. Dr. Miller diagnosed her with a fibromyalgia flare-up and degenerative disc/degenerative joint disease

AO72A
(Rev. 8/82)

of the axial spine and prescribed Relafen.  She also advised plaintiff to reinstitute the Ultram and to continue the massage exercises and water therapy.  (Tr. 302).

On February 11, 1999, plaintiff had improved.  (Tr. 409).  She requested an increase in her Celexa dosage due to some continued depression.  However, she was no longer experiencing panic symptoms.  Dr. Deen increased plaintiff's dosage of Celexa and told her to maintain her current Klonopin dosage.  (Tr. 409).

On March 11, 1999, plaintiff indicated that her mood felt relatively stable.  (Tr. 408).  The only medication side effect reported was drowsiness.  Plaintiff continued to have problems with muscle pain.  Dr. Deen noted that plaintiff was pleasant, cooperative, and appeared to be in a good mood.  He indicated that she suffered from dysthymia and a history of panic disorder that was stable on medication.  (Tr. 408).

On May 4, 1999, plaintiff reported that the medications were working.  (Tr. 407).  She was not certain whether or not she would be employed full-time for the next school year, but she was getting ready to take her certification exam.  Progress notes reveal that plaintiff appeared to be in good spirits with appropriate mood and affect.  Dr. Deen diagnosed her with dysthymic disorder in good control. He advised plaintiff to continue taking the Celexa and Klonopin.  (Tr. 407).

On July 8, 1999, plaintiff experienced increased IBS symptoms to include nausea, periumbilical abdominal pain, headaches, and blurred vision.  (Tr. 163).  An examination revealed lower-mid abdominal tenderness.  Dr. Stephen Stagg diagnosed her with an IBS exacerbation and prescribed a trial of Clindex.  (Tr. 163).

6

On July 26, 1999, plaintiff reported pain in her neck, fever, and a sore throat. (Tr. 406). She indicated that she had been taking her Celexa and Klonopin which had improved her mood. Dr. Deen noted that plaintiff had not been feeling depressed. An examination revealed stiffness in the jaw, tense muscles, and a relatively stable mood. After diagnosing her with dysthymic disorder under fairly good control, Dr. Deen directed plaintiff to continue taking the Celexa and Klonopin. (Tr. 406).

On July 28, 1999, plaintiff complained of pain at the occiput and limited cervical range of motion making it difficult for her to drive. (Tr. 301). Plaintiff indicated that she had been unable to go to attend the HealthSouth fibromyalgia program because she could not fit it into her schedule. On examination, Dr. Miller noted 1 to 2+ tender point tenderness with an intact range of motion. However, her cervical movements were markedly limited. Dr. Miller diagnosed plaintiff with fibromyalgia with a flaring of occipital pain and a postural component. Dr. Miller recommended that plaintiff be evaluated by physical therapy for exercises aimed at improving her posture, general strengthening of her axial spine and extremities, and myofascial release. She also prescribed Flexeril. (Tr. 301).

On November 3, 1999, plaintiff reported continued difficulties with diffuse aches and pains. (Tr. 299). She stated that she had stopped taking the Celexa because she felt it made her more depressed. Further, plaintiff did not go to physical therapy or contact the water therapy resources as directed. Dr. Miller noted diffuse tender point tenderness and tenderness at the anserine bursae. She diagnosed plaintiff with fibromyalgia with some superimposed post-traumatic pain at the knees, palms, and MCP's but without evidence of synovitis, signs of fracture, or limitation of motion or movement. Dr. Miller then prescribed Ultram and Celebrex and directed plaintiff to get a family physician and to

7

follow-up with Dr. Dean, her psychiatrist/psychologist, and establish with HealthSouth to see if she qualified for their fibromyalgia program.  (Tr. 299).

On November 10, 1999, plaintiff stated that she had discontinued the Celexa because it made her depressed.  (Tr. 404).  Dr. Deen noted that plaintiff had a history of taking antidepressants for a while and then stopping them on her own.  Plaintiff indicated that she had been depressed because a neighbor died in her house and in her presence.  In addition, her nephew had recently been killed in a car crash.  Progress notes reveal that plaintiff was tearful and sad.  Chronic depression and dysphoric dysthymia were also present.  Dr. Deen diagnosed her with dysthymic disorder with some decompensation secondary to acute bereavement.  He directed her to continue the Klonopin and prescribed Remeron.  (Tr. 404).

On December 16, 1999, plaintiff reported being depressed over the previous month.  (Tr. 403).  Records indicate that she was not overtly tearful or sad but did report having suicidal ruminations.  Dr. Deen opted to have her continue the Klonopin and switched her from Remeron to Serzone due to the side effects she was experiencing with the Remeron.  He also advised her to see a therapist as soon as possible.  (Tr. 403).

By January 17, 2000, plaintiff's mood had improved on the Serzone.  (Tr. 402).  However, she felt like the dosage needed to be increased because she continued to experience some agoraphobia.  Progress notes indicate that plaintiff had finally agreed to go to the Jones Center for exercise help regarding her fibromyalgia.  Dr. Deen directed her to continue the Klonopin and Serzone.  (Tr. 402).

8

On January 27, 2000, plaintiff was treated by Dr. Stagg for symptoms most likely associated with IBS.  (Tr. 162).  Dr. Stagg prescribed stool guaiacs, Fibercon, increased water intake, and Milk of Magnesia.  (Tr. 162).

On February 17, 2000, plaintiff complained of side effects associated with the Serzone, namely headaches and drowsiness.  (Tr. 400).  She indicated that she had discontinued the medication.  As a result, plaintiff had again begun to experience crying spells and a "fair amount" of obsessional worry.  Accordingly, Dr. Deen switched her from Serzone to Nortriptyline and directed her to continue the Klonopin.  (Tr. 400).

On March 1, 2000, plaintiff had a flaring of axial pain after doing some housework.  (Tr. 298).  She developed some midline posterior neck pain, paravertebral pain down to the lower back with some associated forearm pain and a flare above her tendinitis at the forearms.  Plaintiff was participating in water movement therapy at the Jones Center and reported that it was helping her symptoms as well as her self-esteem.  On examination, Dr. Miller noted diffuse tender point tenderness most pronounced at the midline, upper neck, across the trapezoid, and up the lateral medial elbows and forearms.  Dr. Miller referred plaintiff to HealthSouth for further evaluation and treatment to include myofascial release.  She also prescribed Vicodin, Ultram and Myoflex liniment.  (Tr. 298).

From March 2000 until February 2001, plaintiff intermittently participated in a physical therapy program through HealthSouth.  (Tr.204-229).  At the time of her initial evaluation, plaintiff's pain was affecting her activities of daily living.  (Tr. 216).  In the intake interview, the physical therapist noted that plaintiff showed signs of chronic fibromyalgia, such as loss of muscle tone, but indicated that she had good potential for rehabilitation and would likely benefit from the physical therapy program.  (Tr.

9

217).  On April 11, 2001, plaintiff was discharged from physical therapy due to her failure to return for treatment as advised.  (Tr. 231).

On April 18, 2000, plaintiff requested a different antidepressant.  (Tr. 405).  She stated that she was unable to take the Nortriptyline.  Although she had been participating in the water aerobics program at the Jones Center, plaintiff indicated that she still tended to get "bummed out and depressed."  Dr. Deen noted that she was a bit more irritable than normal and was expressing her anger through sarcasm.  He also documented a fair amount of obsession and worry.  Dr. Deen directed plaintiff to continue the Klonopin and prescribed Zoloft.  Due to the fact that she had previously experienced headaches while taking this medication, Dr. Deen prescribed a low dosage.  (Tr. 405).

On June 8, 2000, plaintiff indicated that she had been participating in therapy and was also receiving massage therapy.  (Tr. 297).  As such, she did not try the Myoflex liniment previously prescribed.  Plaintiff stated that she had experienced migraine headaches prior to her trip to California and that the headaches continued during her trip.  However, at the time of her appointment, the headaches were not as severe.  An examination revealed tenderness at the lateral hips but she was otherwise less tender than previously noted.  Dr. Miller noted that plaintiff's fibromyalgia was somewhat improved although plaintiff was more tired.  She directed plaintiff to continue taking Klonopin, Ultram, and Celebrex.  (Tr. 297).

On July 6, 2000, plaintiff was treated for a tension headache.  (Tr. 172).  Records indicate that she had received a Toradol injection the previous day.  Plaintiff was given Midrin and Maxalt.  (Tr. 173).

10

On July 21, 2000, plaintiff was reportedly doing fairly well. (Tr. 401). She complained of frustration regarding her husband and a situation with her daughter. However, plaintiff also discussed plans for an upcoming trip to New Hampshire and Vermont to visit family. Dr. Deen noted that plaintiff tended to internalize quite a bit of anger and frustration. There were no overt side effects from her medication and she was clearly motivated to talk. He directed her to continue the Klonopin and Zoloft, stating that she could increase the Zoloft if necessary. (Tr. 401).

On September 6, 2000, plaintiff had a flare up right gluteal pain. (Tr. 295). The pain radiated into the right lateral thigh and down the leg causing "a bit of numbness." She indicated that therapy had helped in the past, as had an injection. An examination revealed 2-3 tender point tenderness just posterior to the right great trochanteric prominence. As such, Dr. Miller administered an injection of Kenalog into this area. She then diagnosed plaintiff with fibromyalgia with flaring at the right lateral hip and bursitis. Dr. Miller ordered water therapy and noted that plaintiff had recently been on vacation to New Hampshire and had done "fine in that locale." (Tr. 295).

On September 15, 2000, plaintiff was in a fair amount of pain. (Tr. 399). She was reportedly participating in a therapy program and felt as though she was "doing relatively good considering." An examination revealed some difficulty with walking but plaintiff's mood was relatively good. Dr. Deen diagnosed her with dysthymic disorder, depression not otherwise specified, and dependent personality disorder. He then directed plaintiff to continue the Klonopin and increased her dosage of Zoloft. (Tr. 399).

On September 27, 2000, plaintiff was treated by Dr. John Gaston after stepping off of a porch and injuring her right leg. (Tr. 172). An examination revealed discoloration, tenderness, and swelling

11

from just below the knee all the way down to the ankle.  A hard mass was also noted within a bruise over the inferior-medial leg, just above the knee.  Dr. Gaston believed this to be a calcification in a hematoma.  As x-rays revealed no fractures, the doctor prescribed Lortab.  (Tr. 172).

On November 7, 2000, Dr. Miller switched plaintiff from Celebrex to Vioxx.  (Tr. 295).  Then, on November 9, 2000, plaintiff complained of increased pain in her hands.  Dr. Miller indicated that she could take two Ultram daily and should apply Zostrix cream to her hands.  (Tr. 295).

On November 13, 2000, plaintiff reported that the injection she had  received on September 6 had only helped her for a day.  (Tr. 294).  The therapy was also noted to be helpful.  Because plaintiff had sustained a few falls, injuring her lower right leg, therapy was extended to cover these injuries.  Records indicate that she was improving.  (Tr. 294).

On February 3, 2001, plaintiff was injured when a door slammed on her right forearm.  (Tr. 170-171).  An x-ray of her wrist was unremarkable.  (Tr. 170-171).

On February 16, 2001, plaintiff indicated that she had been taking her medication regularly and was doing fairly well on the Zoloft and Klonopin.  (Tr. 398).  Dr. Deen noted that she had been experiencing continued problems with degenerative discs in her neck and was having a difficult time moving about and sleeping.  She inquired about increasing her Klonopin dosage but Dr. Deen told her that her dosage was already high enough.  He diagnosed her with dysthymic disorder, depression not otherwise specified, and dependent personality disorder.  Dr. Deen directed her to continue the Klonopin and increased her dosage of Zoloft.  He also prescribed Seroquel to help her sleep.  (Tr. 398).

On February 27, 2001, plaintiff reported worsening posterior neck pain. (Tr. 292).  She indicated that the pain was generally localized but did occasionally shoot into the suprascapular areas.

12

Plaintiff also described some spontaneous and transient numbness occurring in the second, third, and fourth fingers without any associated color change.  She stated that she was no longer attending water therapy because her hands got cold easily and the water was never warm enough.  In addition, plaintiff complained of persistent chronic lower back pain with intermittent radiation of pain into her right leg.  An examination did reveal diffuse tender point tenderness in the elbows, upper back (with muscle spasm), anterior chest, lateral hips, and inner knees.  Because plaintiff could not remember trying Neurontin, Dr. Miller represcribed this medication.  Plaintiff also requested a prescription for Guaifenesin at the recommendation of a friend, and Dr. Miller provided her with some information on that.  An MRI of plaintiff's neck and lumbar spine were ordered and plaintiff was told that she could double her Vioxx dosage occasionally but for no longer than a few days at a time.  (Tr. 292-293).

On March 5, 2001, an MRI of plaintiff's cervical spine revealed a mild bulging of the annulus fibrosus at the C4-5 level and a minimal annular bulge at the C5-6 level.  (Tr. 314).  An MRI of her lumbar spine showed mild degenerative changes involving the L1-2 and L4-5 levels and mild facet degenerative disease at the L4-5 level.  (Tr. 315).

On May 12, 2001, plaintiff was involved in an automobile accident.  (Tr. 175-176, 498-504).  Plaintiff's vehicle struck a pothole, ran off the road, and rolled over several times.  Records indicate that she was not restrained and was found unresponsive in the backseat of the car.  A significant decrease in heart rate was noted shortly after plaintiff was evaluated in the emergency room.  Dr. Wayne Hudac noted a complex laceration above her left eyelid with some periorbital edema in both eyes.  No other external abnormalities were noted.  However, a CT scan of her head revealed some left orbital swelling.  Dr. Hudac had plaintiff admitted to ICU for close observation, IV hydration, and

13

serial exams.  He noted her history of alcohol abuse and alerted the hospital staff to look for any signs of delirium tremens.  Plaintiff was discharged home on May 14, 2001.  (Tr. 498-504).

From August 2001 until October 2001, plaintiff participated in physical therapy.  (Tr. 182-193).  Her diagnosis was post-traumatic back pain.  However, on November 19, 2001, plaintiff was discharged from therapy because she was inconsistent with her treatment.  (Tr. 182).

On June 28, 2001, Dr. Miller noted plaintiff's recent car accident and the fact that plaintiff did not go to physical therapy after the accident.  (Tr. 291).  Plaintiff presented with persistent mid-back pain.  Traumatized areas included the upper neck, right knee, right heel, and head.  An examination revealed that plaintiff's peripheral joints were without swelling or limitation of movement.  She was however, tender at the inner right knee and her fibromyalgia tender points were "only trace positive" with tenderness in the right mid-back paravertebrals.  Dr. Miller prescribed physical therapy.  (Tr. 291).  Then, on August 22, 2001, she prescribed Ultram.  (Tr. 291).

On July 26, 2001, continued to express symptoms of depression, anger, and anxious mood.  (Tr. 396-397).  She was not, however, suicidal and was not experiencing hallucinations or delusions.  Dr. Aubrey Chambers, a psychiatrist at Ozark Guidance Center, noted that plaintiff's mood was mildly dysphoric with some anger and sadness regarding a situation with her daughter.  Records indicate that plaintiff had some manifest short-term memory difficulties with questionable impaired memory versus affective syndrome due to a previous closed head injury.  Dr. Chambers diagnosed plaintiff with major depression versus adjustment disorder.  She directed plaintiff to continue the Zoloft and Seroquel and refused to prescribe Klonopin due to plaintiff's memory difficulties.  Dr. Chambers also referred plaintiff to counseling.  (Tr. 397).

14

On August 23, 2001, plaintiff continued to have some impairment of mood with reduced interest in taking care of her farm animals.  (Tr. 395).  She denied alcohol or drug abuse, hallucinations, delusions, and suicidal or homicidal ideation.  Plaintiff indicated that she had not made a counseling appointment because she could not afford it.  Dr. Chambers reminded plaintiff of the Ozark Guidance Center's policy that a patient seeing a psychiatrist must also be in counseling and encouraged her to make an appointment.  She also noted that plaintiff had increased her dosages of Seroquel and Zoloft on her own.  (Tr. 395).

On September 13, 2001, plaintiff reported continued back pain that interfered with her usual activities.  (Tr. 393).  She also complained of increased feelings of grief.  Dr. Chambers suggested ways to assist plaintiff's body in performing her daily chores.  She recommended the addition of sedentary hobbies to allow plaintiff to stay active during times when she was unable to perform physical tasks.  Dr. Chambers then increased plaintiff's Zoloft dosage.  (Tr. 393).

On October 11, 2001, Dr. Chambers again increased plaintiff's Zoloft dosage due to continued problems with sleeping and motivation.  (Tr. 391).  She noted some concern about the mild organic brain syndrome plaintiff suffered as a result of her automobile accident and how increasing her medication dosages might affect plaintiff's memory.  So, Dr. Chambers stated that she would be very carful about medication changes.  (Tr. 391).

On October 25, 2001, Dr. Miller referred plaintiff to Dr. Raben for evaluation of her lower back pain.  (Tr. 289).  She also advised plaintiff to continue water movement therapy and use Icy-Hot patches.  (Tr. 289).

15

On November 8, 2001, plaintiff was feeling anxious.  (Tr. 394).  Plaintiff had been caring for a relative who had recently undergone oral surgery.  Other than some restlessness and some mild pressure in speech, Dr. Chambers noted no thought disorder.  Plaintiff's mood was mild-to-moderately anxious.  As such, Dr. Chambers directed plaintiff to continue the Zoloft and Seroquel.  (Tr. 394).

On November 30, 2001, Dr. Cyril Raben assessed plaintiff with a compression fracture at the L2 level, degenerative disc disease or a herniation in the cervical spine, and post-concussive syndrome. (Tr. 386-390).  The spine disability index revealed that plaintiff's medication afforded her moderate relief.  However, it also showed that she needed some help with personal care and could not lift heavy weights off of the floor.  An examination revealed pain and tenderness on palpation of the cervical spine, paraspinous musculature, and facets.  She was stable to heel and toe walk and her muscular strengths were intact and symmetrical for shoulder abduction, elbow flexion and extension, wrist dorsi and palmar flexion, and finger flexion and abduction.  Dr. Raben recommended that she be prescribed medication for pain, spasm, and inflammation.  He was also of the opinion that plaintiff begin a physical therapy regimen.  Dr. Raben did state that if plaintiff's pain persisted, it might require "other intervention."  (Tr. 390).

By January 29, 2002, plaintiff had reportedly discontinue both the Zoloft and the Seroquel. (Tr. 387).  For several days, she experienced a recurrence of symptoms.  Accordingly, plaintiff resumed taking the Zoloft which had resulted in "some lifting of her mood."  However, sleep, appetite, energy, and motivation all remained a problem.  Dr. Chambers noted that plaintiff's mood was mildly to moderately depressed with no evidence of suicidal ideation, hallucinations, or delusions.  As such,

16

she diagnosed plaintiff with a recurrent major depressive episode and dysthymic disorder and prescribed Zoloft and Seroquel.  (Tr. 387).

On February 15, 2002, plaintiff continued to have a "significant degree of depressed mood with some mild irritability."  (Tr. 383).  She was sleeping well and taking her medication as prescribed.  No psychotic symptoms were reported and plaintiff was not suicidal or homicidal.  Dr. Chambers noted that plaintiff's mood was mildly depressed.  She increased plaintiff's Zoloft dosage and directed plaintiff to continue taking the Seroquel.  (Tr. 383).

On March 13, 2002, plaintiff stated that she had stopped the Zoloft due to headaches.  (Tr. 382).  However, her depression and anxiety had returned.  Dr. Chambers noted that she was neither suicidal nor psychotic.  She found no evidence of thought disorder, hallucinations, or delusions.  Therefore, Dr. Chambers prescribed Effexor.  She also noted that plaintiff continued to refuse to see a counselor for psychotherapy.  (Tr. 382).

On April 19, 2002, plaintiff was reportedly sleeping well.  (Tr. 384).  She indicated that the Effexor seemed to stabilize her mood until mid-day when she began to get depressed, anxious, and irritable.  Plaintiff stated that she was looking forward to a motorcycle trip with her husband beginning the next month.  Dr. Chambers noted no evidence of thought disorder, hallucinations, or delusions.  Plaintiff's mood was euthymic and her memory and judgment were intact.  As such, Dr. Chambers increased her Effexor dosage. (Tr. 384).

On April 25, 2002, plaintiff was treated for lower back pain, a compression fracture at the L2 level, fibromyalgia with moderate sensitivity tender point tenderness, and epicondylitis.  (Tr. 286).  Dr. Miller prescribed Vioxx, Ultram, and a Lidocaine and Kenalog injection.  Plaintiff was also

17

advised to continue water movement therapy, use tennis elbow bands, and avoid excessive straining with the third, fourth, and fifth fingers.  (Tr. 286).

On June 12, 2002, plaintiff reported some continued depression.  (Tr. 381).  However, she indicated that she had discontinued the Effexor because it caused weight gain.  Dr. Chambers noted a mildly dysphoric mood with intact memory and judgment.  However, plaintiff stated that she had just returned from an "enjoyable motorcycle trip to California with her husband and ha[d] obtained her own license to drive a motorcycle."  Uncertain as to whether an antidepressant would benefit plaintiff or not, Dr. Chambers opted to start her on Wellbutrin SR.  (Tr. 381).

On July 2, 2002, plaintiff indicated that the Wellbutrin was not helping her.  (Tr. 380).  She was reportedly experiencing anxiety on a daily basis.  Dr. James Boydstun, a psychiatrist at Ozark Guidance Center, diagnosed plaintiff with dysthymic disorder, generalized anxiety, and a history of head trauma with mild expressive aphasia.  He ordered laboratory tests to evaluate her thyroid and prescribed Klonopin.  (Tr. 380).

On July 12, 2002, plaintiff stated that she felt about the same.  (Tr. 379).  She reported that she had lost her medications and needed refills.  Dr. Boydstun, a psychiatrist at Ozark Guidance Center, noted that plaintiff seemed a little "brighter" and was smiling.  In fact, she indicated that she felt "better" and attributed this to the stormy weather.  Plaintiff seemed to be sincerely apologetic and regretted losing her medication.  Therefore, Dr. Boydstun wrote her new prescriptions and added Cytomel to her regimen, since her thyroid studies were found to be within normal limits.  (Tr. 379).

On August 22, 2002, plaintiff was treated by Dr. Robin Ross, another psychiatrist at Ozark Guidance Center.  (Tr. 378).  Plaintiff was cooperative, had goal directed speech with a normal rate

18

and tone, euthymic mood, appropriate affect, good impulse control, good insight and judgment, and

no notable thought process or content disorders.  Overall, she reported that she was doing much better.

However, she was fearful that her seasonal (winter) depression would start.  Dr. Ross diagnosed her

with dysthymic disorder and directed her to continue the Seroquel and Klonopin.  She also advised

plaintiff to call if her depression returned and an antidepressant would be prescribed.  (Tr. 378).

On September 22, 2002, plaintiff complained of fatigue.  (Tr. 358).  A physical exam was

unremarkable.  Dr. David Clay advised plaintiff to continue her current medications.  (Tr. 358).

On October 1, 2002, plaintiff reported an excessive amount of sadness and some accompanying

disinterest in activities.  (Tr. 377).  She stated that she was continuing to participate in her exercise

program but was not involved in psychotherapy.  However, plaintiff and her husband had opened a

hardware store and she was reportedly working eight hours per day, five to six days per week.  Dr.

Chambers noted that plaintiff's speech was relevant and coherent without evidence of thought disorder,

hallucinations, or delusions.  Her mood was mildly depressed and she talked with animation about the

hardware store and her hopes for it.  Plaintiff's memory and judgment were both said to be adequate.

As such, Dr. Chambers prescribed Lexapro and directed plaintiff to continue taking the Klonopin and

Seroquel.  (Tr. 377).

On December 12, 2002, Dr. H. Wain Lindley, Jr., a staff psychiatrist at Ozark Guidance

Center, evaluated plaintiff for medication management.  (Tr. 375-376).  Plaintiff stated that she had

been "very depressed" for the past two weeks.  She attributed this to the onset of winter darkness and

her annual seasonal depression.  Dr. Lindley noted that plaintiff's rapport was good with no unusual

behaviors, she was reasonably verbal and spontaneous, her sensorium was grossly intact, her thought

19

processes were coherent and relevant with content focused thought, she exhibited no psychotic processes, her mood was depressive in tone, suicidal ideation was absent, her affect was dysthymic with a superimposed smile, and she did not appear overtly anxious. Because the evaluation of her depression was complicated by her history and a possible seasonal component, Dr. Lindley concluded that plaintiff may benefit from an increase in her dosage of Lexapro. Therefore, her Lexapro dosage was increased and plaintiff was directed to continue taking the Klonopin and Seroquel at their current doses. (Tr. 375).

On January 9, 2003, plaintiff complained of increased depression, especially after returning to her house. (Tr. 373). The living area of her home was reportedly dark and Dr. Huwieler noted this seemed to result in increasing plaintiff's level of depression. Plaintiff had also stopped going to her workout and was missing the benefits of the program. Dr. Huwieler recommended the possible addition of some brief light therapy upon her arrival home. (Tr. 373).

On February 13, 2003, plaintiff was doing "pretty well." (Tr. 371). Dr. Huwieler noted that she still had not adequately resumed her exercise program or taken corrective action regarding the darkness of her television room. However, plaintiff was reportedly getting outside more and feeling better for doing so. (Tr. 371).

On June 4, 2003, plaintiff was reportedly doing "pretty well overall." (Tr. 370). Dr. Clay noted that the increased dosage of Lexapro appeared to be helpful. Plaintiff was said to be both friendly and engaging. As such, Dr. Clay directed her to continue taking the Lexapro and Klonopin. (Tr. 370).

20

On an intake form for Decision Point, Inc., a drug and alcohol treatment facility, plaintiff indicated that she smoked marijuana several times per week and consumed four to six beers per day. (Tr. 321-322). She indicated that she had begun drinking in 1970 and began using marijuana when she was eighteen. Her last beer was August 16, 2003, and her last joint was smoked on August 14, 2003. On September 11, 2003, plaintiff was admitted for detoxification. (Tr. 340, 346-356). Plaintiff was discharged home on October 8, 2003, after satisfactorily completing the program. (Tr. 357).

Eighteen months prior to her enrollment in the drug treatment program, plaintiff was jailed for intoxication, breaking and entering, slashing tires, and cutting a cable on a car. (Tr. 367).

On January 9, 2004, plaintiff was treated for facial pain and pain to her back, neck, and left wrist due to being "jumped" by her boyfriend one week prior. (Tr. 486-489). A physical exam was normal, revealing only contusions. However, x-rays revealed a left inferior medial orbital fracture. (Tr. 488).

On February 14, 2004, plaintiff returned to Dr. Raben's office. (Tr. 472). She reported significant problems with lower back and right extremity pain. An examination revealed tenderness on palpation of the lower lumbar spine, paraspinous musculature and facets ,and a marked reduction in range of motion. Dr. Raben concluded that plaintiff probably had lumbar disc degeneration and/or herniation. He ordered an MRI of her lumbar spine. In the meantime, he directed her to take over-the-counter nonsteroidal anti-inflammatory medications for pain management. (Tr. 472).

On February 17, 2004, plaintiff underwent an MRI of her lumbar spine. (Tr. 462-463). It revealed a chronic anterior vertebral body compression fracture of the L2with twenty to thirty percent loss of vertebral body height, an L1-2 small broad based disc bulge that mildly flattened the ventral

21

aspect of the thecal sac with no spinal canal stenosis, moderate degenerative disc changes, anterior broad based disc bulges as well as anterior projecting osteophytes at the L1-2 level, and mild reversal of the normal lumbar lordosis at the L1-2 level. (Tr. 463).

On February 20, 2004, plaintiff rated her pain as an eight on a scale of one to ten. (Tr. 471). An examination revealed tenderness to palpation of the lumbar spine. Plaintiff indicated that the majority of her pain was located in the upper portion of her lumbar spine. A marked reduction of range of motion was also noted. Dr. Raben prescribed disc space injections at the L1-2 and L4-5 levels. (Tr. 471). The first injection was administered on February 26, 2004, with the second one occurring on March 12, 2004. (Tr. 477, 480).

On February 23, 2004, a total body scan revealed mild increased activity involving the left aspect of the approximate L4 and L5 levels and central aspect to the approximate L1 level, probably due to degenerative change. (Tr. 464). A small amount of increased activity involving the proximal right humerus and marked increased activity of each elbow region were noted. Therefore, x-rays of the right shoulder and elbows were recommended. (Tr. 464).

On March 5, 2004, an examination revealed pain and tenderness on palpation of plaintiff's lumbar spine. (Tr. 469). She indicated that the upper portion of her lumbar spine seemed to be where the majority of her pain was located. A decreased range of motion in her lumbar spine was also noted. Records reveal that plaintiff was scheduled to undergo a disc space injection at the L4-5 level the following Friday. (Tr. 469-470).

By March 26, 2004, plaintiff had undergone disc space injections at the L1-2 and L4-5 levels. (Tr. 467-468). She reported relief with both of these injections. However, plaintiff indicated that her

22

pain was now a seven on a scale of one to ten and that it felt like her back moved "around and across the lower back." She indicated that she was not working and had not worked in six years. An examination revealed a decreased range of motion in the lumbar spine but no pain or tenderness to palpation. (Tr. 467).

On April 12, 2004, plaintiff complained of mid-to-lower back pain and right lower extremity pain. (Tr. 443, 466). She indicated that her pain was fifty to sixty percent worse since her last visit. Dr. Raben recommended a lateral bone dowel fusion procedure at the L1-2 level followed by a posterior minimally invasive fusion with instrumentation using Blackstone. He was of the opinion that plaintiff would qualify for disability under "105.C of the Social Security Statutes." (Tr. 443, 466).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

23

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff suffered from fibromyalgia and several associated illnesses, namely degenerative disc disease, a compression fracture at the L2 level, osteoarthritis, depression, anxiety, and a personality disorder.  We note, however, that plaintiff was not always compliant with her treatment.  *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).  Although plaintiff was repeatedly prescribed physical and water therapy to treat her fibromyalgia, the record reveals that plaintiff failed to consistently participate in these programs.  In fact, she was discharged from therapy on two occasions for inconsistency.

Likewise, while the record shows that plaintiff suffered from anxiety, depression, and a personality disorder, the evidence also reveals that plaintiff discontinued her medications at will on a regular basis.  *Id*.  It is noted that plaintiff's symptoms returned each time she discontinued her medication.  Clearly, had plaintiff's condition been as severe as she alleged, she would not have discontinued her medication without consulting with her physician prior to doing so.

Further, the medical record indicates that plaintiff's mental condition did respond to treatment when she took the medication as prescribed.  (Tr. 375, 395, 396-397, 406, 408, 411).  Several of plaintiff's psychiatric progress records from Ozark Guidance Center indicate that her condition was

24

stable.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quotation omitted).

With regard to plaintiff's IBS symptoms, we note that she sought treatment for this condition only two occasions during the relevant time period.  (Tr. 162, 163).  *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).  As such, we do not find this condition, singularly, or in combination with her fibromyalgia and other associated illnesses to be disabling.

Similarly, we do not find evidence to support plaintiff's contention of disability due to memory problems.  In July 2001, plaintiff was noted to have some possible short-term memory loss due to an automobile accident.  (Tr. 396-397).  By October 2001, Dr. Chambers was hesitant to change plaintiff's medication dosages due to concerns that it could negatively affect her memory.  (Tr. 391).  However, by 2002, plaintiff's memory was noted to be intact and remained intact throughout the remainder of the relevant time period.  (Tr. 377, 381, 384).  Accordingly, we cannot say that plaintiff suffered from a memory impairment that prevented her from working.

Although plaintiff was diagnosed with fibromyalgia and degenerative disc disease in the early 1990s, she worked in various teaching positions from 1987, until her contract with the Parson's Public Schools ended on June 30, 1999.  (Tr. 74, 158).  *Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (claimant worked with her impairments for years).  Further, plaintiff returned to work even after being diagnosed with a compression fracture at the L2 level in 2001.  *See Nettles v. Sullivan*, 956 F.2d 820, 823 (8th Cir. 1992) (holding that plaintiff's return to work, in spite of her pain, contradicted her claim for disability).  Then, in 2002, plaintiff and her husband had opened a hardware store and plaintiff

25

reported working eight hours per day five to six days per week. (Tr. 377).  By 2004, when Dr. Raben recommended that she undergo fusion surgery, plaintiff was working as an aide accompanying an 11-year-old autistic boy to each of his classes to keep him on task. (Tr. 538).  She remained employed as a resource teacher's aide at the time of the second administrative hearing on November 1, 2005. (Tr. 551).  As such, we find substantial evidence to support the ALJ's conclusion that plaintiff's fibromyalgia and associated impairments are not disabling.

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability.  On a supplemental interview outline, plaintiff reported an ability to care for her personal hygiene, wash dishes, shop for groceries and clothing, go to the bank and post office, prepare three meals per week, pay bills, use a checkbook, count change, drive, watch TV, listen to the radio, read, feed her farm animals, and visit friends and family. (Tr. 90-91).  In addition, plaintiff felt well enough to take a trip to California in June 2000, a trip to New Hampshire in August 2000, and a motorcycle trip to California in 2002. (Tr. 295, 297. 378, 381).  Plaintiff also reported obtaining a motorcycle license for herself in 2002.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Therefore, although plaintiff may experience some difficulties associated with her mental or emotional

26

health, we find that the ALJ, after considering all of the relevant evidence, properly concluded that these difficulties did not render plaintiff disabled.

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform light work limited only by her mental limitations.  It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.15459©, while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional.  *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, additional mental status evaluations, plaintiff's subjective complaints, and her medical records.  On January 2, 2004, Dr. Steve Owens completed a physical RFC assessment.  (Tr. 432-441).  After reviewing plaintiff's medical records, he concluded that plaintiff could lift ten pounds

27

frequently and twenty pounds occasionally, as well as stand, walk, and sit for about six hours during an eight-hour workday.  (Tr. 433).

On January 9, 2004, Dr. Kathryn Gale completed a psychiatric review technique form and a mental RFC assessment of plaintiff.  (Tr. 414-427, 428-430).  Based on the medical evidence of record, Dr. Gale opined that plaintiff was mildly limited in her activities of daily living and in maintaining social functioning; moderately limited in her ability to maintain concentration, persistence, or pace; and, had experienced no episodes of decompensation of extended duration.  (Tr. 424).  She also concluded plaintiff was moderately limited in her ability to complete a normal workday and make plans independently of others.  No significant limitations were noted with regard to any other areas of functioning.  Dr. Gale stated that plaintiff could perform work where the interpersonal contact was routine but superficial, the complexity of tasks was learned by experience with several variables, the use of judgment was limited, and the supervision required was little for routine but detailed for non-routine.  (Tr. 428-430).

Although the ALJ noted Dr. Raben's 2004 opinion that plaintiff was disabled, he properly dismissed this opinion because it is inconsistent with the record as a whole.  *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (citations omitted) ("Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole.") The record shows that plaintiff had returned to work after her alleged onset date.  In fact, although outside the relevant time period, plaintiff was working at the time of both administrative hearings performing a job that required that she sit, stand, and walk for seven hours per day.  This, in spite of the fact that Dr. Raben had recommended that she undergo fusion surgery on her back.  As such, it is

28

clear to the undersigned that the plaintiff was not disabled.  Therefore, we find substantial evidence to support the ALJ's conclusion that plaintiff can perform light work where the interpersonal contact was routine but superficial, the tasks were learned through experience with several variables, the judgment was used within limits, and the supervision was little for routine activities but detailed for non-routine activities.

In addition, we find substantial evidence supports the ALJ's finding that plaintiff could still perform work that exists in significant numbers in the national economy.  In response to the ALJ's hypothetical question, the VE assumed a hypothetical individual of plaintiff's age, education, and vocational background; who can occasionally lift or carry 20 pounds; can stand or walk for six hours in an eight hour work period; can sit for a total of six hours in an eight hour work period; and with some limitations on the ability to maintain concentration and attention for extended periods of time. (Tr. 557).  In her testimony, the VE indicated that with the given assumptions, the plaintiff could not return to her past relevant work.  (Tr. 546).  However, there were other jobs available in the regional economy or national economy, such as a call out operator (400 jobs regionally and 59,000 nationally); cleaner and  housekeeper (7,236 regionally and 1,500,000 nationally); and, a cashier II, (8,367 regionally and 750,000 nationally).  (Tr. 19, 561).  We note that a VE's response to a properly posed hypothetical question constitutes substantial evidence to support an ALJ's findings.  *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Further, given the fact that plaintiff was working at the time of the hearing, it is clear that plaintiff was capable of returning to work.

29

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and recommend that the decision be affirmed.  The undersigned further recommends that the plaintiff's Complaint be dismissed with prejudice.

DATED this <u>12th</u> day of June 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

30